# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————

ALEJANDRO RODRIGUEZ, *et al.*,
*Petitioners-Appellees/Cross Appellants*,
v.
DAVID MARIN, *et al.*,
*Respondents-Appellants/Cross Appellees.*

———————

On Appeal from the United States District Court,
Central District of California
No. 2:07-cv-03239-TJH-RNB

———————

## BRIEF OF PROFESSORS OF CONSTITUTIONAL, IMMIGRATION, AND ADMINISTRATIVE LAW AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS-APPELLEES/CROSS APPELLANTS

———————

Adam B. Cox
Robert A. Kindler Professor of Law
New York University School of Law
Vanderbilt Hall 509
40 Washington Square
New York, NY 10012
adambcox@nyu.edu
(212) 992-8875

Dennis B. Auerbach
Philip J. Levitz
Blake B. Hulnick
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001-4956
dauerbach@cov.com
(202) 662-6000

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE* ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT ........................................................................................ 4

I.  Before *Mezei*, Noncitizens Seeking Admission Were Entitled To Due Process. ........................................................................................ 4

    A.  The Supreme Court's Earliest Plenary Power Cases Were Grounded In A View That Exclusion And Deportation Were "Executive" Matters—Not A View That Arriving Noncitizens Were Unprotected By The Due Process Clause. ................................. 5

    B.  As Early As The Turn Of The Twentieth Century, The Supreme Court Expressly Recognized That Noncitizens In Immigration Proceedings Are Protected By The Due Process Clause. .................... 9

II.  Post-*Mezei* Developments In The Law Confirm That Detention Of Entering Noncitizens Must Comport With Due Process. ........................... 16

    A.  The Court's Modern Approach To Extraterritoriality Counsels Against Withholding Protection From Detained Entrants. ................ 17

    B.  Since *Mezei*, The Supreme Court Has Recognized Strict Limits On Indefinite Civil Detention, Including In The Immigration Context. ............................................................................... 19

    C.  Modern Procedural Due Process Doctrine Sweeps Far More Broadly Than It Did In The Era Of *Mezei*. ...................................... 21

III.  *Mezei* Should Not Be Construed To Hold That Entering Noncitizens Can Be Detained Indefinitely Without Due Process. .................................. 25

CONCLUSION ..................................................................................... 29

CERTIFICATE OF FILING AND SERVICE ...................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addington v. Texas*,
  441 U.S. 418 (1979)................................................................22

*Benson v. McMahon*,
  127 U.S. 457 (1888)..................................................................7

*Boumediene v. Bush*,
  553 U.S. 723 (2008)............................................................18, 19

*Bridges v. Wixon*,
  326 U.S. 135 (1945)................................................................23

*In re Brooks*,
  5 F.2d 238 (D. Mass. 1925) ....................................................16

*Chae Chan Ping v. United States*,
  130 U.S. 581 (1889)..............................................................7, 9

*Chew Hoy Quong v. White*,
  249 F. 869 (9th Cir. 1918) ......................................................13

*Chin Yow v. United States*,
  208 U.S. 8 (1908)................................................12, 13, 14, 15

*United States ex rel. Chu Leung v. Shaughnessy*,
  88 F. Supp. 91 (S.D.N.Y. 1950) ..............................................15

*Fiallo v. Bell*,
  430 U. S. 787 (1977)................................................................24

*Fong Yue Ting v. United States*,
  149 U.S. 698 (1893)..........................................................*passim*

*Foucha v. Louisiana*,
  504 U.S. 71 (1992)..................................................................19

*Gagnon v. Scarpelli*,
  411 U.S. 778 (1973)................................................................22

*In re Gault*,
  387 U.S. 1 (1967) ........................................................22

*Gegiow v. Uhl*,
  239 U.S. 3 (1915) ........................................................12

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ....................................................22

*Heikkila v. Barber*,
  345 U.S. 229 (1953) ......................................................8

*Hilton v. Merritt*,
  110 U.S. 97 (1884) ........................................................7

*Hughes v. United States ex rel. Licata*,
  295 F. 800 (3d Cir. 1924) ............................................13

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ......................................................8

*Jackson v. Indiana*,
  406 U.S. 715 (1972) ....................................................20

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ................................................2, 3

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) ....................................................20

*Kerry v. Din*,
  135 S. Ct. 2128 (2015) ................................................24

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ..............................................*passim*

*In re Krajcirovic*,
  87 F. Supp. 379 (D. Mass. 1949) ................................15

*Kwock Jan Fat v. White*,
  253 U.S. 454 (1920) ..............................................11, 12

*Landon v. Plasencia*,
459 U.S. 21 (1982)............................................................20, 23, 24

*Louie Poy Hok v. Nagle*,
48 F.2d 753 (9th Cir. 1931) ..............................................13

*Low Wah Suey v. Backus*,
225 U.S. 460 (1912).........................................................12, 14

*Martin v. Mott*,
25 U.S. (12 Wheat.) 19 (1827) ..........................................7

*Mathews v. Eldridge*,
424 U.S. 319 (1976).........................................................21, 22

*Morrissey v. Brewer*,
408 U.S. 471 (1972).........................................................22

*Murphy v. Ramsey*,
114 U.S. 15 (1885)...........................................................18

*Den ex dem. Murray v. Hoboken Land & Improvement Co.*,
59 U.S. (18 How.) 272 (1855) ...........................................7

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892)....................................................*passim*

*In re Oliver*,
333 U.S. 257 (1948).........................................................22

*Oteiza v. Jacobus*,
136 U.S. 330 (1890).........................................................7

*Ex parte Perkov*,
45 F. Supp. 864 (S.D. Cal. 1942)......................................15

*Phila. & Trenton R.R. Co. v. Stimpson*,
39 U.S. (14 Pet.) 448 (1840).............................................7

*Reid v. Covert*,
354 U.S. 1 (1957).............................................................17

iv

*Reno v. Flores,*
    507 U.S. 292 (1993)...........................................................................21

*United States v. Salerno,*
    481 U.S. 739 (1987)...........................................................................20

*Schall v. Martin,*
    467 U.S. 253 (1984)...........................................................................20

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953).....................................................................*passim*

*Staniszewski v. Watkins,*
    80 F. Supp. 132 (S.D.N.Y. 1948) ...................................................15

*Tang Tun v. Edsell,*
    223 U.S. 673 (1912)...........................................................................12

*United States ex rel. Tisi v. Tod,*
    264 U.S. 131 (1924)...........................................................................13

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018).......................................................................24

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990)....................................................................17, 18

*Wong Wing v. United States,*
    163 U.S. 228 (1896).......................................................................9, 15

*Yamataya v. Fisher,*
    189 U.S. 86 (1903)..........................................................9, 10, 11, 22

*Zadvydas v. Davis,*
    533 U.S. 678 (2001)..............................................................20, 21, 28

## Other Authorities

Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion
    and Expulsion of Aliens in the United States* (1912) ..........................14

Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362 (1953) ................................................................................................4

Jerry L. Mashaw, *Creating the Administrative Constitution* (2012) ......................11

Jerry L. Mashaw, *Due Process in the Administrative State* (1985)..........................6

Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939 (2011) .............................................................................10

Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559 (2007) ................................................................................6

U.S. Dep't of Labor, Sec'y of Labor's Comm. on Admin. Procedure, Report: The Immigration & Naturalization Service, Report (May 17, 1940) ................................................................................7, 15

Transcript of Record, Return to Writ of Habeas Corpus, *Yamataya v. Fisher*, 189 U.S. 86 (No. 171) ........................................................10

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are eight leading professors of constitutional law, immigration law, and administrative law. *Amici* have substantial expertise related to the due process rights of noncitizens, and a professional interest in ensuring that this Court is fully informed of the jurisprudence and history relevant to this case.

Specifically, *amici curiae* submit this brief to address the Government's reading of the Supreme Court decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) and its progeny. The Government relies on *Mezei* to argue that arriving noncitizens have no due process rights with respect to their prolonged detention. Such a broad reading of *Mezei* is not justified: it is inconsistent with the history of constitutional and immigration law before *Mezei*; it is undermined by the development of these bodies of law since *Mezei* was decided; and it is not compelled by the *Mezei* opinion itself.

*Amici*[2] are:

- Erwin Chemerinsky, Dean and Jesse H. Choper Distinguished Professor of Law, University of California, Berkeley School of Law;

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici* affirm that all parties consent to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

[2] Institutional affiliations are provided for identification purposes only.

- Aziz Huq, Frank and Bernice J. Greenberg Professor of Law, University of Chicago Law School;

- Jerry L. Mashaw, Sterling Professor of Law Emeritus and Professorial Lecturer, Yale Law School;

- Hiroshi Motomura, Susan Westerberg Prager Distinguished Professor of Law, School of Law, University of California, Los Angeles;

- Gerald L. Neuman, J. Sinclair Armstrong Professor of International, Foreign, and Comparative Law, Harvard Law School;

- Cristina M. Rodríguez, Leighton Homer Surbeck Professor of Law, Yale Law School;

- David Strauss, Gerald Ratner Distinguished Service Professor of Law, University of Chicago Law School; and

- Stephen Vladeck, A. Dalton Cross Professor of Law, The University of Texas at Austin School of Law.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

After concluding that this case could not be resolved on statutory grounds, the Supreme Court remanded to this Court, with instructions to consider Petitioners'-Appellees' arguments that the Constitution requires bond hearings in cases of prolonged detention. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018). The Government relies on *Mezei* to support its position that arriving noncitizens may be detained for prolonged periods without the right to a bond hearing. In particular, throughout this litigation, the Government has cited *Mezei*'s statement that, for

noncitizens "on the threshold of initial entry," "'[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" 345 U.S. at 212 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)); *see* Brief of Respondents-Appellants at 32, ECF No. 174 (quoting this passage); *see also* Brief for Petitioner at 19, *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) (No. 15-1204).

Although *Mezei*—a case decided amid the national security concerns of the early Cold War—is often cited with *Knauff* for the proposition that entering noncitizens have no due process rights with respect to their detention—or at all—that reading paints with far too broad a brush. Read in historical context, *Mezei* (like *Knauff*) holds only that the Government is owed great deference in the decision *to admit or exclude* noncitizens. It should not be construed to hold that entrants have no due process right to be free from prolonged confinement, let alone that such individuals have no due process rights at all. As explained below, there was little or no precedent to support the notion that arriving noncitizens lacked due process rights before *Mezei*; indeed, several cases had held to the contrary. The Government's broad reading of *Mezei* also is inconsistent with later case law applying a flexible, functional approach to the Constitution's extraterritorial reach. And as more recent cases show, the Government's position overlooks a key distinction between the Government's power to *exclude* and its power to *detain*. Even if arriving

noncitizens lack due process rights with respect to their admission, those individuals still may not be detained without basic procedural safeguards.

This Court should reject a reading of *Mezei* that would leave arriving noncitizens either without rights with respect to their detention or wholly beyond the Constitution's reach. It should affirm that arriving noncitizens, like the Petitioner class members seeking asylum, cannot be deprived of their liberty for a prolonged period without a meaningful opportunity to be heard.

## ARGUMENT

### I. Before *Mezei*, Noncitizens Seeking Admission Were Entitled To Due Process.

The Supreme Court's pre-*Mezei* jurisprudence militates against the Government's broad reading of that case. In the decades leading up to *Mezei* and *Knauff*, the Supreme Court consistently assumed that arriving noncitizens stopped at the border, like noncitizens inside the United States, were protected by the Due Process Clause. For *all* noncitizens, the Government's "power to lay down general rules" governing entry to the United States, even if "plenary," was not understood to include the "power to be arbitrary or to authorize administrative officials to be arbitrary." Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1390–91 (1953). Neither did it prevent the federal courts from ensuring observance of the basic "constitutional guarantee of due process." *Id.*

**A.    The Supreme Court's Earliest Plenary Power Cases Were Grounded In A View That Exclusion And Deportation Were "Executive" Matters—Not A View That Arriving Noncitizens Were Unprotected By The Due Process Clause.**

The relevant history of the Supreme Court's due process jurisprudence begins with two decisions from the 1890s, both cited in *Mezei*: *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892), and *Fong Yue Ting v. United States*, 149 U.S. 698 (1893). *Nishimura Ekiu* upheld an executive decision to exclude a Japanese noncitizen, and *Fong Yue Ting* upheld a decision without judicial process to expel a Chinese noncitizen. In each case, the Court rejected the noncitizen's claim that the exclusion and expulsion procedures violated due process. The Court concluded that, "although congress might, if it saw fit, authorize the courts to investigate and ascertain the facts upon which the alien's right to land was made by the statutes to depend," it also was free to "intrust the final determination of those facts to an executive officer." *Fong Yue Ting*, 149 U.S. at 713 (citing *Nishimura Ekiu*, 142 U.S. at 660). The officer's "order was due process of law, and no other tribunal, unless expressly authorized by law to do so, was at liberty to re-examine the evidence on which he acted, or to controvert its sufficiency." *Id*.

The Court's conclusion in the early 1890s that exclusion and expulsion decisions could be entrusted to executive branch officials was not based on a conclusion that arriving noncitizens lack due process rights. Nor did it reflect something exceptional about the treatment of immigration decisions made by federal officials.

Instead, the holdings in *Nishimura Ekiu* and *Fong Yue Ting* were the product of prevailing administrative law and separation-of-powers principles of their era.

When *Nishimura Ekiu* was decided in 1892, the requirements of due process were intimately linked to nineteenth-century thinking about Article III and the separation of powers. Characteristic of its era, the decision was based on formal notions about the separation of judicial and executive functions in the constitutional order. As explained in an important article regarding the development of modern administrative law, "a framework that was used throughout the nineteenth century . . . separate[d] matters that required 'judicial' involvement from matters that the political branches could conclusively adjudicate on their own." Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 564 (2007); *see also* Jerry L. Mashaw, *Due Process in the Administrative State* (1985). In other words, some matters were considered judicial, and others executive. The former had to be resolved by an Article III tribunal and conform to strict procedural rules regarding the presentation and appropriate consideration of evidence—requiring, in essence, a common-law trial. But the latter could be entrusted to executive discretion without any particular requirement of procedural fairness.[3]

_____

[3] In further support of this understanding, an influential 1940 study of immigration procedures recognized: "The only standards of procedure familiar to courts and lawyers of the [1890s] were standards of judicial procedure. . . . The alternative to holding inapplicable the only standards which were familiar, however, seemed at

In line with this understanding, the Court in *Nishimura Ekiu* held that "the final determination of those facts [governing exclusion] may be [en]trusted by congress to executive officers," 142 U.S. at 660, because it concluded that exclusion and expulsion decisions should not be considered judicial questions. This separation-of-functions reasoning is made clear by the cases on which the Court relied in rejecting the claim that due process required judicial process. None of the cases on which the Court relied are immigration cases. Instead, they are cases on issues ranging from patents to customs, in which the Court was required to decide whether a claim involved a private right that must be heard by an Article III tribunal or, instead, a public right that could be entrusted to executive officials. *See id.*[4]

---

first to be a holding that no standards were applicable." U.S. Dep't of Labor, Sec'y of Labor's Comm. on Admin. Procedure, *Report: The Immigration & Naturalization Service* 46 (May 17, 1940).

[4] The cases *Nishimura Ekiu* cites are *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827) (replevin); *Phila. & Trenton R.R. Co. v. Stimpson*, 39 U.S. (14 Pet.) 448 (1840) (patent); *Benson v. McMahon*, 127 U.S. 457 (1888) (extradition); *Oteiza v. Jacobus*, 136 U.S. 330 (1890) (extradition); *Den ex dem. Murray v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272 (1855) (customs); and *Hilton v. Merritt*, 110 U.S. 97 (1884) (customs). That said, the decision in *Nishimura Ekiu* to treat exclusion decisions as executive rather than judicial matters is related to the Court's earlier holding, in *Chae Chan Ping v. United States*, 130 U.S. 581 (1889), that a noncitizen's right to reside would not be treated as analogous to traditional common law property rights. *See id.* at 602–03 (contrasting treaties regulating noncitizens' rights in real property with treaties regulating noncitizens' rights of residence).

Thus, the due process claims rejected in *Nishimura Ekiu* and *Fong Yue Ting* failed because of then-prevailing views about the separation of judicial and executive functions in the nascent administrative state, views connected to traditional conceptions of what counted as a liberty or property interest protected by the Due Process Clause. The Court did not conclude that noncitizens in the exclusion or expulsion context had no due process rights, or no constitutional rights at all. In fact, *Nishimura Ekiu* itself held that noncitizens, even those stopped at the border, possessed constitutional rights: it concluded that a noncitizen "prevented from landing by [an] officer claiming authority to do so under an act of congress, and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful." *Id.* at 660.[5]

In other words, when traditional liberty interests were implicated by the government's enforcement of immigration law, the Court did not hesitate to conclude that noncitizens—even those at the border—could invoke the Constitution to protect those interests. Just a few years later, the Court drove home this conclusion,

---

[5] As the Supreme Court has explained, habeas review conducted during this period was required by the Constitution, because Congress had enacted finality provisions whose effect was to preclude review "*except insofar as it was required by the Constitution.*" *Heikkila v. Barber*, 345 U.S. 229, 234–35 (1953) (emphasis added); *see also INS v. St. Cyr*, 533 U.S. 289, 304–05 (2001) (confirming that review during the so-called "finality period" described in *Heikkila* reflected the minimum review required by the Suspension Clause).

applying due process principles to strike down a federal immigration enforcement statute. In *Wong Wing v. United States*, 163 U.S. 228 (1896), the Court invalidated a statute requiring that some unlawful immigrants be put to hard labor prior to their deportation. The Court held that the Bill of Rights protected noncitizens—even those unlawfully present in the United States—from punishment by the federal government without process consistent with the Fifth and Sixth Amendments. *See id.* at 237 ("[T]o declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial.").

**B.** **As Early As The Turn Of The Twentieth Century, The Supreme Court Expressly Recognized That Noncitizens In Immigration Proceedings Are Protected By The Due Process Clause.**

The Court's initial conclusion in *Chae Chan Ping* and *Fong Yue Ting*, that exclusion and deportation decisions were non-judicial matters, was extremely short-lived. When this formalistic separation-of-powers thinking began to break down at the dawn of the twentieth century, the Court retreated from its earlier conclusion that exclusion and deportation decisions could be made without any judicial process or hearing. In *Yamataya v. Fisher*, 189 U.S. 86 (1903), the Court declared that "[we have] never held, nor must be now be understood as holding, that administrative officers, when executing the provisions of a statute involving

the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution." *Id.* at 100. The *Yamataya* Court expressly recognized that the Due Process Clause demands some kind of hearing for noncitizens facing removal—even for noncitizens like Kaoru Yamataya, whom the government argued had clandestinely entered the United States just a few days before she was taken into custody. *See* Transcript of Record at 4, Return to Writ of Habeas Corpus, *Yamataya v. Fisher*, 189 U.S. 86 (No. 171) (contending that Yamataya had "surreptitiously, clandestinely, unlawfully and without any authority come into the United States of America"). According to the Court, the due process required for such individuals must, at a minimum, include notice of the charges against them and an opportunity to be heard. *See Yamataya*, 189 U.S. at 94, 100–01.

The approach taken by the *Yamataya* Court reflected changing attitudes regarding due process, Article III, and administrative law in the early twentieth century. At the time *Yamataya* was decided, the nineteenth century views of administrative law on which *Nishimura Ekiu* was based were under pressure. *See* Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 942 (2011) ("Not until the early decades of the twentieth century did courts embrace the salient features of the appellate review model [of administrative law], which allowed

decisional authority to be shared between agencies and courts."); *see also* Jerry L. Mashaw, *Creating the Administrative Constitution* 65–78 (2012) ("[I]t would take more than a century for the [John] Marshallian idea of 'discretion' as 'political' and outside judicial jurisdiction to give way to a more modern understanding of the reach of judicial review of administrative action.").

Reflecting these changing perspectives, the *Yamataya* Court departed from the approach typified by *Nishimura Ekiu* of categorically separating judicial decisions that are subject to procedural protections from executive decisions that are not.  Instead, the Court explained that the due process owed in executive decisions should be calibrated to the interests at stake.  The process due must "be appropriate to the nature of the case upon which . . . officers are required to act."  *Yamataya*, 189 U.S. at 101.  Once the Court had discarded the categorical separation of judicial and executive decision-making spheres, it made clear that the decision to deport a noncitizen, even one present just four days, implicates sufficiently important interests to require basic due process protections.

Critically for present purposes, in the years following *Yamataya*, the Supreme Court applied the same reasoning to exclusion statutes, construing them to require a fair hearing and to prohibit arbitrary administrative action.  For example, in *Kwock Jan Fat v. White*, 253 U.S. 454 (1920), the Court granted relief in an exclusion case on the ground that "the hearing accorded to the petitioner was unfair

and inconsistent with the fundamental principles of justice embraced within the conception of due process of law." *Id.* at 459. Similarly, in *Gegiow v. Uhl*, 239 U.S. 3 (1915), the Court reversed a decision excluding noncitizens because an administrative official had exceeded the scope of his authority, which the Court held was "no better than a decision without a fair hearing." *Id.* at 9–10. Likewise, in *Tang Tun v. Edsell*, 223 U.S. 673 (1912), the Court reviewed an exclusion decision to ensure that the authority of the officers rendering the determination was "fairly exercised, that is, consistently with the fundamental principles of justice embraced within the conception of due process of law." *Id.* at 681–82. And in *Chin Yow v. United States*, 208 U.S. 8 (1908), the Court granted habeas relief from an exclusion order because the Government could not satisfy the "presupposition that the [exclusion] decision was after a hearing in good faith." *Id.* at 12; *cf. Low Wah Suey v. Backus*, 225 U.S. 460, 468 (1912) ("A series of decisions in this court has settled that such [exclusion and deportation] hearings before executive officers may be made conclusive *when fairly conducted*." (emphasis added)).

Although some of these early fair-hearing cases involved claims by arriving passengers that they were citizens, neither the Supreme Court's logic nor its language was limited to putative citizens. *Low Wah Suey*, for example, explained that the executive officials were prohibited from "depriv[ing] the alien of a fair, though

summary, hearing."  225 U.S. at 471–72 (affirming order of deportation after proceeding requiring "a hearing . . . at which the alien shall have full opportunity to show cause why he should not be deported," among other procedural requirements).  Moreover, in subsequent cases the Court treated fair-hearing principles as applicable in immigration proceedings not involving citizenship claims.  *See, e.g.*, *United States ex rel. Tisi v. Tod*, 264 U.S. 131, 132, 134 (1924) (holding that an alien in deportation proceedings was not "denied due process of law" because "no hasty, arbitrary, or unfair action on the part of any official, or any abuse of discretion, [was] shown").  Courts of Appeal, including this Court, did so as well.  *See, e.g.*, *Louie Poy Hok v. Nagle*, 48 F.2d 753, 754 (9th Cir. 1931) (granting relief from an exclusion order challenged on the ground that "the [noncitizen] was not accorded a fair hearing (and that the findings and excluding decision were not supported by substantial evidence)"); *Chew Hoy Quong v. White*, 249 F. 869, 870 (9th Cir. 1918) ("[T]here clearly is no warrant for basing [an admission] decision, in whole or in part, on confidential communications, the source, motive, or contents of which are not disclosed to the applicant or her counsel, and where no opportunity is afforded them to cross-examine, or to offer testimony in rebuttal thereof, or even to know that such communication has been received."); *Hughes v. United States ex rel. Licata*, 295 F. 800, 802 (3d Cir. 1924) (holding, in an exclusion case involving a noncitizen, that under *Chin Yow* "[f]ederal courts have jurisdiction to

determine . . . whether, in the circumstances, the alien has been denied a proper hearing and a fair trial").

As the pre-*Mezei* cases suggest, the Supreme Court did not recognize sharp distinctions between noncitizens already admitted to the country and those who had not yet entered.  To the contrary, the Court treated these groups as largely interchangeable for due process purposes and held that *both* groups are entitled to basic procedural fairness.  This is best illustrated by *Low Wah Suey*, *supra*, where the Court applied the same due process analysis to "laws forbidding aliens or classes of aliens *from coming within the United States*," and those "provid[ing] for the *expulsion* of aliens or classes of aliens from its territory."  225 U.S. at 467–68 (emphasis added); *see also Chin Yow*, 208 U.S. at 12 (subjecting "statutes purport[ing] to exclude aliens" to due process-type review).

Leading commentators recognized that these cases established a general principle that noncitizens, whether entering the United States for the first time or not, are entitled to basic due process guarantees.  A respected early twentieth century immigration treatise explained that "[t]he [due process] principles" applicable to noncitizens "are equally applicable to aliens, who, *not having been admitted to the United States* are detained for deportation by executive officers."  Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 139–41 (1912) (emphasis added).

A major government report on immigration prepared in 1940 as part of a larger project examining principles of administrative procedure echoed this conclusion. *See* U.S. Dep't of Labor, Sec'y of Labor's Comm. on Admin. Procedure, *Report: The Immigration & Naturalization Service* (May 17, 1940). The report documented the rise during the first decades of the twentieth century of a general principle—applicable in both exclusion and expulsion proceedings—that immigration procedures must be fair and reasonable. *See id.* at 45. Moreover, it characterized that requirement as "nothing less than a transformation in judicial doctrine when compared with the doctrines enunciated in the *Nishimura Ekiu*, *Fong Yue Ting* and immediately succeeding cases." *Id.*[6]

---

[6] As the Supreme Court held in *Wong Wing*, lower courts continued to understand the Due Process Clause to protect more than just a noncitizen's right to a hearing on whether she would be excluded or deported. In a number of cases, for example, lower courts specifically limited the length of arriving noncitizens' detentions on due process grounds. *See, e.g.*, *Ex parte Perkov*, 45 F. Supp. 864, 867 (S.D. Cal. 1942) ("An alien taken into custody cannot be held indefinitely. If an order directing his deportation to one of the places permitted by the statute cannot be executed for some time, he must be released from custody upon proper proceedings therefor being taken."); *see also United States ex rel. Chu Leung v. Shaughnessy*, 88 F. Supp. 91, 92 (S.D.N.Y. 1950) (suggesting reasonable limit on time noncitizen may be detained even where exclusion not possible to effectuate); *In re Krajcirovic*, 87 F. Supp. 379, 382 (D. Mass. 1949) (limiting immigration detention of noncitizen seized at the border to two months from date of court's exclusion decision on ground that "wherever the Constitution of the United States is applicable, and that includes ports of entry, an alien as well as a citizen is guaranteed that he will not be deprived of his liberty without due process of law"); *Staniszewski v. Watkins*, 80 F. Supp. 132, 135 (S.D.N.Y. 1948) (ordering release of noncitizen detained at Ellis Island for almost

In sum, in the time period leading up to *Knauff* and *Mezei*, courts and commentators widely recognized that exclusion and deportation decisions required administrative hearings consistent with fundamental fairness (and judicial oversight) to satisfy due process.

## II.    Post-*Mezei* Developments In The Law Confirm That Detention Of Entering Noncitizens Must Comport With Due Process.

The Supreme Court's decisions since *Mezei* have only clarified that due process applies to noncitizens on the threshold of entry, especially when deprivation of physical liberty is at issue.  *First*, the Supreme Court has extended the Constitution's protections to noncitizens well beyond the nation's borders, an approach inconsistent with any argument that arriving noncitizens are unprotected by the Due Process Clause.  *Second*, the Court has developed important limits on civil confinement—including in the immigration context—reinforcing its longstanding view that a person's physical confinement at the hands of the Government implicates fundamental liberty interests protected by the Due Process Clause.  *Third*, the Court has completed the due process revolution sparked by the growth of the administrative state in the early twentieth century, cementing procedural due process protections for legal interests far less compelling than the fundamental liberty interest in being free from prolonged detention.

seven months); *In re Brooks*, 5 F.2d 238, 239 (D. Mass. 1925) (power to exclude and deport does not include power to detain indefinitely).

**A.** **The Court's Modern Approach To Extraterritoriality Counsels Against Withholding Protection From Detained Entrants.**

Recent decisions regarding the Constitution's extraterritorial scope make clear that noncitizens on the threshold of entry cannot, consistent with Supreme Court law, be deemed wholly outside the protection of the Due Process Clause.

Since *Mezei*, the Supreme Court has repeatedly rejected any bright-line rule making constitutional protections categorically inapplicable to persons outside the nation's borders. Instead, the Court assesses questions of extraterritorial application in a functional manner, an approach incompatible with a blanket rule that inadmissible noncitizens are at the unfettered whim of executive officials.

Shortly after *Mezei*, the Court expressly rejected the theory that constitutional protections stop at the water's edge. In *Reid v. Covert*, 354 U.S. 1 (1957), the Court recognized that the constitutional right to jury trial encompassed Americans abroad. *See, e.g.*, *id.* at 8 (plurality opinion) ("This Court and other federal courts have held or asserted that various constitutional limitations apply to the Government when it acts outside the continental United States.").

In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the majority held that the Fourth Amendment did not apply to the seizure of a noncitizen's property occurring entirely abroad. But the Court expressly contrasted the Fourth Amendment, which it held applies only to "the people" who are part of the national community, with the Fifth Amendment, which applies broadly to all "persons." *Id.*

17

at 265–66.  Justice Kennedy's controlling opinion embraced a functional test, asking whether it would be "impracticable and anomalous" for the Fourth Amendment's requirements to apply in the relevant circumstances.  *Id.* at 278 (Kennedy, J., concurring).

More recently, in *Boumediene v. Bush*, 553 U.S. 723 (2008), the Court expanded upon the "impractical and anomalous" test.  Holding that the Constitution's Suspension Clause, Art. I, § 9, cl. 2, applies to noncitizens held at Guantanamo Bay, the Court explained that "extraterritoriality questions turn on objective factors and practical concerns, not formalism."  *Id*. at 727.  "Even when the United States acts outside its borders, its powers are not 'absolute and unlimited' but are subject 'to such restrictions as are expressed in the Constitution.'"  *Id.* at 765 (quoting *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885)).  The Court explained that whether the Constitution applies outside the United States does not depend on formalistically determining whether the U.S. Government exercises *de jure* sovereignty over the territory in question.  The question instead is whether there exist "practical barriers" to affording a particular constitutional protection to individuals subject to Government control outside the nation's borders.  *Id*. at 770.  Absent such "practical barriers," the Government's extraterritorial conduct is subject to constitutional constraint.

With *Boumediene*, the Court clarified that a functional approach determines the Constitution's extraterritorial application. This functional approach requires that noncitizens on the threshold of entry be afforded due process protection against prolonged detention. If the Supreme Court no longer views the *reality* of extraterritorial detention as preventing the Constitution from applying, the legal fiction of an alien standing "at the threshold of entry" necessarily cannot have that result. Noncitizens held at the border by U.S. authorities are subject to the Government's control, and there are no "practical barriers" to affording them due process rights with respect to prolonged detention. Accordingly, there is no basis for their prolonged detention without due process protections.

**B.  Since *Mezei*, The Supreme Court Has Recognized Strict Limits On Indefinite Civil Detention, Including In The Immigration Context.**

The Supreme Court's modern substantive due process cases expressly recognize the importance of an individual's interest in being free from prolonged detention, underscoring that it is not a mere "privilege" outside the scope of the Due Process Clause. These cases hold that civil detention must be limited to a narrow class of individuals and must be subject to rigorous procedural safeguards.

As the Court explained in *Foucha v. Louisiana*, 504 U.S. 71 (1992), "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Id.* at 80. "In our society liberty is the norm,

and detention prior to trial or without trial is the carefully limited exception."
*United States v. Salerno*, 481 U.S. 739, 755 (1987).  Accordingly, the Court has re-
quired that the Government meet a heavy burden before subjecting an individual to
prolonged civil confinement.  *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 357
(1997) (commitment requires greater proof than "a mere predisposition to vio-
lence").  Detention may last no longer than necessary to advance the Government's
legitimate purposes.  *See, e.g.*, *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (hold-
ing "the nature and duration of commitment [must] bear some reasonable relation
to the purpose for which the individual is committed"); *Hendricks*, 521 U.S. at
363–64 (sexual offenders may be incapacitated only for as long as stated purpose
remains); *Salerno*, 481 U.S. at 747 (emphasizing "stringent time limitations" on
permissible pretrial detention); *see also Schall v. Martin*, 467 U.S. 253, 269 (1984)
(pretrial detention of alleged juvenile delinquents "strictly limited in time").

In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Court made clear that the
principle that civil confinement must be strictly limited applies in the immigration
context.  The Court began by recognizing that due process applies to the detention
of noncitizens subject to a final order of removal.  While the Court noted that "the
nature of that protection may vary depending upon the status and circumstance,"
*id.* at 694 (citing *Landon v. Plasencia*, 459 U.S. 21, 32–34 (1982)), it held that
even a noncitizen subject to a final order of removal could not be detained for more

than a reasonable time to effectuate that order, which presumptively should not exceed six months. *See id.* at 701.[7]

In reaching this result, *Zadvydas* separated a noncitizen's traditional liberty interest in being free from "long-term detention" from any interest in living in the United States under the immigration statutes. *Id.* at 697. The Court recognized that noncitizens who lose their removal cases have no right to live at large in the United States, and that the political branches are fully empowered to remove noncitizens. *See id.* The *Zadvydas* Court explained, however, that the removal power is not at issue when the Government's exercise of its immigration authority results in the prolonged *detention* of noncitizens. Rather, detention is a constitutional matter that must be considered separately from "the political branches' authority to control entry into the United States," and must be subject to strict due process limits. 533 U.S. at 695, 699–701.

### C. Modern Procedural Due Process Doctrine Sweeps Far More Broadly Than It Did In The Era Of *Mezei*.

Procedural due process "is a principle basic to our society." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). Since *Mezei*, the Supreme Court has significantly broadened the reach of procedural due process protections.

---

[7] *See also Reno v. Flores*, 507 U.S. 292, 314 (1993) (upholding INS policy of maintaining custody of noncitizen juveniles pending deportation proceedings only where "period of custody [was] inherently limited by the pending deportation hearing" and was expected to last "an average of only 30 days").

Under the modern framework, the Due Process Clause limits the power of the Government in all instances where a Government decision may deprive an individual of his liberty. *See, e.g.*, *Addington v. Texas*, 441 U.S. 418, 425 (1979) (civil commitment); *In re Gault*, 387 U.S. 1, 31–32 (1967) (juvenile delinquency); *In re Oliver*, 333 U.S. 257, 274–75 (1948) (contempt of court); *see also Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973) (revocation of probation); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (revocation of parole).

Rather than operating on the basis of formal distinctions between executive and judicial functions, modern procedural due process employs a flexible, functional analysis that extends the approach foreshadowed in *Yamataya*. *See supra* pp. 9–11. First, a court analyzes whether the Government's decision implicates a liberty or property interest protected by the Due Process Clause. Second, the court employs a three-part test to determine which procedures are sufficient to protect that interest against erroneous deprivation, weighing the individual's interest and the benefits of additional procedures against the burdens those procedures would impose on the Government. *See Mathews*, 424 U.S. at 334–35. The weightier the liberty or property interest, the more process is due; thus, for instance, depriving a person of his fundamental interest in freedom from detention would require substantial process. *Cf. id.*; *Hamdi v. Rumsfeld*, 542 U.S. 507, 529–30, 533 (2004) (plurality opinion).

The Court's opinion in *Plasencia* is an example of the Court squarely apply-ing its modern procedural due process framework to the immigration context. Plasencia was a returning lawful permanent resident stopped at the border and ac-cused of attempting to smuggle others into the United States. *See* 459 U.S. at 24–25, 30. Despite her status as a potentially excludable alien standing on the thresh-old of entry, the Court held that Plasencia had an interest protectable under the Due Process Clause. *See id.* at 32. The Court emphasized that the right to reside in the United States is a "weighty" liberty interest protected by due process, where the re-turning noncitizen "stands to lose the right 'to stay and live and work in this land of freedom.'" *Id.* at 34 (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)). Following *Mathews*, the Court explained that "[t]he constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances." *Id.* But it is "[t]he role of the judiciary" to determine whether the administrative hear-ing used to order Plasencia's exclusion "meet[s] the essential standard of fairness under the Due Process Clause." *Id.* at 34–35.

*Plasencia*'s dicta that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application," 459 U.S. at 32, is not a statement that arriving noncitizens lack rights under the Due Process Clause. Nor is it a conclusion that the prolonged *detention* of an arriving

noncitizen implicates no interests protected by the Fifth Amendment. The key language is "regarding his application." The Court's dicta means simply that, if one is a noncitizen seeking initial admission, the interest in residing in the United States is not alone a "protectable" liberty or property interest under the Due Process Clause. *See* 459 U.S. at 32.[8]

Thus, while it remains an open question whether (or when) the decision to deny admission to a noncitizen abroad or on the threshold of entry might implicate interests protected by the Due Process Clause, *cf. Kerry v. Din*, 135 S. Ct. 2128 (2015), nothing in *Plasencia* supports the Government's view that it need not provide any procedures before depriving an individual on the threshold of entry of her physical liberty for a prolonged period. Where, as here, the issue is the indefinite detention of noncitizens who may have no country to which they may safely return, the liberty interest at stake is indisputably a weighty one. Accordingly, at least some meaningful process is due before a noncitizen can be indefinitely detained.

---

[8] *See also Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) ("[T]his Court has recognized that the *admission and exclusion* of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" (quoting *Fiallo v. Bell*, 430 U. S. 787, 792 (1977)) (emphasis added)); *id.* at 2424 (Thomas, J., concurring) (noting "President has inherent authority to *exclude* aliens from the country" (citing *Knauff*, 338 U.S. at 542–43) (emphasis altered)).

**III.** *Mezei* **Should Not Be Construed To Hold That Entering Noncitizens Can Be Detained Indefinitely Without Due Process.**

Understood in light of both what came before it and what came after, *Mezei* and *Knauff* do not stand for the blanket proposition for which they have often been cited by the Government. The cases may recognize broad power for the political branches in regulating *entry* to the United States, particularly amid the heightened security concerns in which those cases arose. But they do not address the analytically distinct problem of civil detention at issue in this case and on which the Supreme Court has placed meaningful limits.

Significantly, the *Mezei* majority did not view the case to be principally about detention. It thus did not specifically address whether indefinite detention without an opportunity to be heard violates the Due Process Clause. The Court did state that the issue to be decided was "whether the Attorney General's continued exclusion of respondent without a hearing amounts to an unlawful detention." *Mezei*, 345 U.S. at 207. But it found in the Government's favor because it determined that the respondent was not being detained at all; he was merely being "harbor[ed]" at Ellis Island because he could not be repatriated. *Id*. at 213. Apart from its recitation of the decision below, *see id*. at 209, the majority did not even mention the word "liberty." For the majority, respondent's "harborage" did not "transform[] this [case] into something other than an exclusion proceeding." *Id*. at 213.

Because the *Mezei* majority did not view the case to be primarily about detention, its holding should not be construed as deciding whether noncitizens on the threshold of entry may be detained indefinitely without a hearing. Thus, when the Court observed that due process for an "alien on the threshold of initial entry" is "[w]hatever the procedure authorized by Congress," it was addressing the "power to expel or exclude aliens," and not the power to detain them indefinitely. *Mezei*, 345 U.S. at 210–12 (citations omitted).

For this reason, the *Mezei* majority's statement should not be afforded the sweeping scope that the Government suggests. It is not properly construed to mean that entering noncitizens have no due process rights whatsoever. Nor is it properly construed to mean that the prolonged detention of such noncitizens does not implicate a liberty interest protected by the Due Process Clause. *See*, *e.g.*, *id*. at 215 ("we do not think that respondent's *continued exclusion* deprives him of any statutory or constitutional right" (emphasis added)); *id*. at 216 ("respondent's *right to enter* the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate" (emphasis added)).

The *Mezei* dissenters underscore that the majority focused on the power to exclude rather than the power to detain. Indeed, the dissenters took issue with the majority on precisely this ground: they argued that the Court *should* have treated the matter before it as involving indefinite detention, and erred by failing to do so.

For Justice Jackson, joined by Justice Frankfurter, the *Mezei* majority wrongly avoided addressing detention based on the "fiction" that Mezei was not in fact detained. *Id*. at 220. According to Justice Jackson, the Government had "ingeniously argued that Ellis Island is [Mezei's] 'refuge' whence he is free to take leave in any direction exception west." *Id*. But no other country would accept Mezei, with the result that such "freedom" to leave Ellis Island would be meaningful only if Mezei "were an amphibian!" *Id*. In Justice Jackson's view, it "overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound." *Id*. For Justice Jackson, Mezei was plainly "deprived of liberty" and the Court thus should have, but did not, determine whether such deprivation was "a denial of due process of law." *Id*. at 220–21. Justice Black's dissent likewise admonished the majority for ignoring the reality of Mezei's situation, arguing that Mezei was, as a practical matter, being "imprison[ed] without a hearing" in violation of the Due Process Clause. *Id*. at 217–18.

More generally, the notion that noncitizens on the threshold of entry have no due process rights simply cannot be an accurate statement of the law. As Justice Jackson recognized in his *Mezei* dissent, if an arriving noncitizen were entirely outside the protection of the Constitution, then the Government could lawfully effectuate the exclusion of such a person by "eject[ing] him bodily into the sea." *Id*. at 226. The Court understandably has never embraced a notion so fundamentally at

odds with constitutional norms. Even the dissenters in *Zadvydas*, while taking a more restrictive view of noncitizens' rights than the majority, effectively acknowledged that *all* noncitizens in the custody of immigration authorities have at least *some* due process rights. Justice Scalia was "sure" that even a noncitizen on the threshold of entry "cannot be tortured." 533 U.S. at 704 (Scalia, J., dissenting). And Justice Kennedy recognized that "both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious"—*i.e.*, detention beyond what is "necessary to avoid the risk of flight or danger to the community." *Id.* at 721 (Kennedy, J., dissenting). The appropriate question, therefore, is not *whether* noncitizens on the threshold of entry have due process rights, but rather how much process is due when a fundamental liberty interest like freedom from indefinite detention is at issue.

In short, no rigid principle of constitutional law places an individual's potentially lifelong detention by U.S. authorities beyond all guarantees of due process, merely because she is deemed to stand at the border. This Court should confirm that *Mezei* does not authorize the detention of entering noncitizens for any purpose (or no purpose), with no limits, and with no opportunity for review. The Government's proposed reading of *Mezei* as mandating such a result contravenes more than a century of case law and the nation's most deeply held values.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Petitioner-Appellee's brief, the district court's permanent injunction should be affirmed on constitutional grounds.

Respectfully submitted,

s/ Philip J. Levitz

| | |
|---|---|
| Adam B. Cox | Dennis B. Auerbach |
| Robert A. Kindler Professor of Law | Philip J. Levitz |
| New York University School of Law | Blake B. Hulnick |
| Vanderbilt Hall 509 | COVINGTON & BURLING LLP |
| 40 Washington Square | One CityCenter |
| New York, NY 10012 | 850 Tenth Street, N.W. |
| adambcox@nyu.edu | Washington, DC 20001-4956 |
| (212) 992-8875 | dauerbach@cov.com |
| | (202) 662-6000 |

July 27, 2018

*Attorneys for Amici Curiae*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify I electronically filed the foregoing with the Clerk for the

United States Court of Appeals for the Ninth Circuit by using the CM/ECF system

on July 27, 2018. All participants in the case are registered CM/ECF users and so

will be served by the CM/ECF system, which constitutes service pursuant to Fed-

eral Rule of Appellate Procedure 25(c)(2) and Ninth Circuit Rule 25-5.


Date: July 27, 2018                     Respectfully submitted,

                                        s/ Philip J. Levitz
                                        Covington & Burling LLP

                                        *Attorney for Amici Curiae*

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** <u>13-56706, 13-56755</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the longer length limit authorized by court order dated <u>Apr 12, 2018</u>
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or <u>29</u> pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | s/ Philip J. Levitz | Date | July 27, 2018

("s/" plus typed name is acceptable for electronically-filed documents)