*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———— • ————

ALEJANDRO RODRIGUEZ, et al.,
*Petitioners-Appellees / Cross-Appellants,*

v.

TIMOTHY ROBBINS, et al.,
*Respondents-Appellants / Cross-Appellees.*

*Appeal from a Decision of the United States District Court for the Central District of California,*
*Case No. 2:07-cv-03239-TJH-RNB · Honorable Terry J. Hatter, Senior District Judge*

## BRIEF OF AMICI CURIAE ADMINISTRATIVE LAW, CIVIL PROCEDURE, AND FEDERAL COURTS PROFESSORS IN SUPPORT OF PETITIONERS-APPELLEES

JONATHAN D. SELBIN
JASON L. LICHTMAN
KATHERINE I. MCBRIDE
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500 Telephone

ANDREW R. KAUFMAN
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
222 Second Avenue South, Suite 1640
Nashville, TN 37201
(615) 313-9000 Telephone

ELIZABETH J. CABRASER
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000 Telephone

*Attorneys for Amici Curiae Administrative Law, Civil Procedure, and Federal Courts Professors*



# INDEX

## LIST OF AMICI*

Pamela K. Bookman
*Assistant Professor of Law, Temple University Beasley School of Law*

Andrew D. Bradt
*Assistant Professor of Law, University of California, Berkeley School of Law (Boalt Hall)*

Maureen Carroll
*Assistant Professor of Law, University of Michigan Law School*

Zachary D. Clopton
*Associate Professor of Law, Cornell Law School*

Brooke Coleman
*Associate Dean for Faculty Research and Faculty Development and Professor of Law, Seattle University School of Law*

Robin Effron
*Professor of Law, Brooklyn Law School*

Helen Hershkoff
*Herbert M. and Svetlana Wachtell Professor of Constitutional Law and Civil Liberties, New York University School of Law*

Alexandra D. Lahav
*Ellen Ash Peters Professor of Law, University of Connecticut School of Law*

David Marcus
*Professor of Law, UCLA School of Law*

Jerry L. Mashaw
*Sterling Professor of Law Emeritus, Yale Law School*

Elizabeth Porter
*Associate Professor and Charles I. Stone Professor of Law, University of Washington School of Law*

Briana Rosenbaum
*Associate Professor of Law, University of Tennessee College of Law*

Michael Sant'Ambrogio
*Professor of Law and Dean of Research, Michigan State College of Law*

Elizabeth Schneider
*Rose L. Hoffer Professor of Law, Brooklyn Law School*

Joanna C. Schwartz
*Vice Dean for Faculty Development and Professor of Law, UCLA School of Law*

Shirin Sinnar
*Associate Professor of Law and John A. Wilson Faculty Scholar, Stanford Law School*

Norman W. Spaulding
*Nelson Bowman Sweitzer and Marie B. Sweitzer Professor of Law, Stanford Law School*

Joan Steinman
*University Distinguished Professor and Professor of Law, Chicago-Kent College of Law*

Adam Zimmerman
*Professor of Law, Gerald Rosen Fellow, Loyola Law School, Los Angeles*

[*] Amici file this brief in their individual capacities and provide their institutional affiliation solely for purposes of identification.

# TABLE OF CONTENTS

**Page**

INDEX: LIST OF AMICI.................................................................. i

CIRCUIT RULE 29-2(a) STATEMENT ....................................... x

INTEREST OF AMICI CURIAE................................................. 1

SUMMARY OF ARGUMENT .................................................... 1

ARGUMENT ............................................................................... 4

I.    The Modern Class Action Rule Was Designed to Facilitate
      Group Challenges to Unlawful Government Practices ...................... 4

      A.    The Advisory Committee That Drafted Rule 23 Intended
            That It Apply Expansively in Civil Rights Cases,
            Including Those For Declaratory Relief ................................... 5

      B.    *Wal-Mart* Embraced Rule 23(b)(2)'s History and Design...... 12

II.   Courts Have Long Relied On Class Actions, Consistent with
      Rule 23's Design, To Resolve Due Process and Other
      Challenges to Government Conduct................................................... 17

      A.    Challenges to Government Conduct Lend Themselves
            to Classwide Determinations Under Traditional Due
            Process Analysis........................................................................ 17

      B.    Challenges to Government Conduct Lend Themselves
            to Classwide Determinations in a Wide Variety of Other
            Cases........................................................................................... 23

      C.    Private Parties, Courts, and the Government Benefit
            From The Well-Established Use of Injunctive Relief
            Class Actions.............................................................................. 28

CONCLUSION............................................................................ 32

CERTIFICATE OF COMPLIANCE............................................ 34

CERTIFICATE OF SERVICE .................................................... 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ............................................................... 5, 12

*Baby Neal v. Casey,*
  43 F.3d 48 (3d Cir. 1994) .................................................... 19, 20

*Barrett v. U.S. Civil Service Comm'n,*
  69 F.R.D. 544 (D.D.C. 1974) ..................................................... 30

*Braggs v. Dunn,*
  317 F.R.D. 634 (M.D. Ala. 2016) ......................................... 14, 22

*Brown v. Board of Education,*
  347 U.S. 483 (1954) ...................................................................... 6

*Brunson v. Bd. of Trustees of Sch. Dist. No. 1 of Clarendon Cty.,*
  30 F.R.D. 369 (E.D.S.C. 1962) .................................................... 7

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) .................................................................... 20

*City of Indianapolis v. Edmond,*
  531 U.S. 32 (2000) ...................................................................... 25

*Cole v. City of Memphis,*
  839 F.3d 530 (6th Cir. 2016) ...................................................... 27

*Coley v. Clinton,*
  635 F.2d 1364 (8th Cir. 1980) .................................................... 19

*DL v. District of Columbia,*
  302 F.R.D. 1 (D.D.C. 2013) ....................................................... 27

*DL v. District of Columbia,*
  713 F.3d 120 (D.C. Cir. 2013) ................................................... 27

*DL v. District of Columbia,*
  860 F.3d 713 (D.C. Cir. 2017) ................................................... 27

*E. Texas Motor Freight Sys. Inc. v. Rodriguez,*
  431 U.S. 395 (1977) .................................................................... 23

*Ebanks v. Shulkin,*
  877 F.3d 1037 (Fed. Cir. 2017) .................................................. 28

# TABLE OF AUTHORITIES
## (continued)

Page

*Frasier v. Board of Trustees of the University of North Carolina*,
134 F. Supp. 589 (M.D.N.C. 1955) ..................................................... 23, 24

*Goldberg v. Kelly,*
397 U.S. 254 (1970) ................................................................................ 21

*Goss v. Lopez*,
419 U.S. 565 (1975) ................................................................................ 20

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ................................................................................ 24

*Greene v. Lindsey*,
456 U.S. 444 (1982) ................................................................................ 20

*Hackley v. Roudebush*,
520 F.2d 108 (D.C. Cir. 1975) ............................................................... 30

*Heckler v. Campbell*,
461 U.S. 458 (1983) ................................................................................ 31

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .................................................................. 21

*In re District of Columbia*,
792 F.3d 96 (D.C. Cir. 2015) .................................................................. 27

*Ingraham v. Wright*,
430 U.S. 651 (1977) ................................................................................ 20

*Jamie S. v. Milwaukee Public Sch.*,
668 F.3d 481 (7th Cir. 2012) ............................................................ 27, 28

*Jennings v. Rodriguez*,
138 S.Ct. 830 (2018) ......................................................................... 10, 16

*Joyner v. McDowell Cnty. Bd. of Educ.*,
92 S.E.2d 795 (N.C. 1956) ....................................................................... 6

*Lippert v. Baldwin*,
No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017) ................... 17

*M.D. v. Perry*,
294 F.R.D. 7 (S.D. Tex. 2013) ...................................................... 14, 16, 27

*M.D. v. Perry,*
   675 F.3d 832 (5th Cir. 2012).............................................................. 14, 27

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ..................................................................... 3, 18, 19

*McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.,*
   8 F.3d 1174 (7th Cir. 1993)................................................................... 25

*McNary v. Haitian Refugee Ctr., Inc.,*
   498 U.S. 479 (1991) .............................................................................. 20

*Murphy v. Piper,*
   No. CV 16-2623, 2017 WL 4355970 (D. Minn. Sept. 29, 2017) ............. 21

*Norwood v. Bain,*
   166 F.3d 243 (4th Cir. 1999)................................................................. 25

*Oatis v. Crown Zellerbach Corp.,*
   398 F.2d 496 (5th Cir. 1968)................................................................. 13

*Ortiz v. Fibreboard Corp.,*
   527 U.S. 815 (1999) ................................................................................ 5

*Parham v. J. R.,*
   442 U.S. 584 (1979) .............................................................................. 23

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014).................................................................. 27

*Phillips Petroleum Co. v. Shutts,*
   472 U.S. 797 (1985) .............................................................................. 29

*Phillips v. Sheriff of Cook Cnty.,*
   828 F.3d 541 (7th Cir. 2016)............................................................ 27, 28

*Potts v. Flax,*
   313 F.2d 284 (5th Cir. 1963).................................................................... 8

*Powers v. Hamilton Cnty. Pub. Defender Comm'n,*
   501 F.3d 592 (6th Cir. 2007).................................................................. 22

*Saravia v. Sessions,*
   280 F. Supp. 3d 1168 (N.D. Cal. 2017) ................................................. 22

*Shelton v. Bledsoe*,
    775 F.3d 554 (3d Cir. 2015)....................................................... 27

*Sourovelis v. City of Phila.*,
    320 F.R.D. 12 (E.D. Pa. 2017) .................................................. 21

*Sullivan v. Zebley*,
    493 U.S. 521 (1990) ................................................................... 26

*Truesdell v. Thomas*,
    889 F.3d 719 (11th Cir. 2018)................................................... 27

*United States v. Storer Broad. Co.*,
    351 U.S. 192 (1956) ................................................................... 31

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003).................................................. 22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................ passim

*Yates v. Collier*,
    868 F.3d 354 (5th Cir. 2017)..................................................... 27

*Zablocki v. Redhail*,
    434 U.S. 374 (1978) ............................................................ 25, 26

**Rules**

Fed. R. Civ. P. 1 ............................................................................... 1

Fed. R. Civ. P. 23(b)(1)(A)............................................................. 9

Fed. R. Civ. P. 23(b)(2) ......................................................... 1, 3, 4

**Treatises**

1 William B. Rubenstein, *Newberg on Class Actions*
    § 3:23 (5th ed. 2017) .................................................... 26, 29, 30

7AA Charles A. Wright et al., *Federal Practice and Procedure*
    § 1775 (3d ed. 2008) ............................................. 4, 13, 17, 26

**Other Authorities**

1 Joseph M. McLaughlin, *McLaughlin on Class Actions*
    § 4:45 (8th ed. 2011) ........................................................ 21, 26

An Oral History of Rule 23: An Interview of Professor Arthur R. Miller
    by Samuel Issacharoff,
    N.Y. Univ. Sch. of Law Ctr. on Civil Justice 5 (Dec. 3, 2016) .................. 7

Brian T. Fitzpatrick, *The Ironic History of Rule 23*, at 11-14
    (Vand. Law Research Paper No. 17-41, Aug. 10, 2017), *available at*
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=3020306 ................ 10

David Marcus, *Flawed but Noble: Desegregation Litigation and
Its Implications for the Modern Class Action*,
    63 Fla. L. Rev. 657 (2011) .................................................... 6, 9

David Marcus, *The History of the Modern Class Action,
Part I: Sturm und Drang, 1953-1980*,
    90 Wash. U. L. Rev. 587 (2013) .............................................. 13

Letter from Charles A. Wright. Professor of Law, Univ. of Texas,
    to Benjamin Kaplan, Professor of Law,
    Harvard Law Sch. (Feb. 6, 1963), *microformed on* CIS-6312-65
    (Jud. Conf. Records, Cong. Info. Serv.)...................................... 8

Letter from Charles Alan Wright, Professor of Law, Univ. of Texas,
    to Benjamin Kaplan, Professor of Law,
    Harvard Law Sch. (Feb. 16, 1963), *microformed on* CIS-7004-34
    (Jud. Conf. Records, Cong. Info. Serv.)...................................... 7

Maureen Carroll, *Class Action Myopia*,
    65 Duke L.J. 843 (2016)........................................................ 9

Memorandum from Benjamin Kaplan and Albert Sacks to
    the Fed. Civil Rules Advisory Comm.
    (Dec. 2, 1963) (on file with authors)........................................ 11

Memorandum, Modification of Rule 23 on Class Actions
    EE-10 to EE-11 (Feb. 1963), *microformed on* CIS-6313-56
    (Jud. Conf. Records, Cong. Info. Serv.)...................................... 7

Memorandum, *Modification of Rule 23 on Class Actions* EE-2 (Feb. 1963),
    *microformed on* CIS-6313-56 (Jud. Conf. Records, Cong. Info. Serv.)..... 8

Michael D. Sant'Ambrogio & Adam S. Zimmerman,
    *Inside the Agency Class Action*, 126 Yale L.J. 1634 (2017).................... 32

**Page**

Michael D. Sant'Ambrogio & Adam S. Zimmerman,
   *The Agency Class Action*, 112 Colum. L. Rev. 1992 (2012) .................... 28

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
   84 N.Y.U. L. Rev. 97 (2009)...................................................... 15

Transcript of Session on Class Actions 11 (Oct. 31, 1963–Nov. 2, 1963),
   *microformed on* CIS-7104-53 (Jud. Conf. Records, Cong. Info. Serv.)... 10

Will A. Gunn & Mary Lou Keener, *Monk v. Shulkin*,
   Court of Appeals for Veterans Claims (Feb. 8, 2018) .............................. 29

**Regulations**

57 Fed. Reg. 12,634, 12,639 (Apr. 10, 1992)................................................. 31

80 Fed. Reg. 78163 (Dec. 16, 2015)........................................................... 31

81 Fed. Reg. 40259, 40260 (June 21, 2016).................................................. 31

## CIRCUIT RULE 29-2(a) STATEMENT

This brief has been filed with the consent of all parties to this action.

Dated:    July 27, 2018                    Respectfully submitted,

                                           */s/ Jason L. Lichtman*
                                           Jason L. Lichtman

## INTEREST OF AMICI CURIAE[1]

Amici are professors of civil procedure, administrative law, and federal jurisdiction who offer a unique perspective about how the Federal Rules of Civil Procedure were designed to help courts review unlawful government policies. Amici have written extensively about due process in the administrative state, the judicial review of government action, and the use of class actions. Together, we share an interest in ensuring that the Federal Rules of Civil Procedure continue to be construed so as to ensure the "just, speedy and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Amici are listed in the Index and file this brief in their individual capacities as scholars. We provide institutional affiliation solely for purposes of identification.

## SUMMARY OF ARGUMENT

Amici submit this brief to explain the use of injunctive and declaratory relief class actions under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Rule 23(b)(2) provides that class actions may be "maintained" when defendants have "acted or refused to act on grounds that

---

[1] No counsel for a party authored any part of this brief, and no person other than amici and their counsel made any monetary contribution toward the preparation or submission of this brief. All parties have consented to the filing of this brief.

apply generally to the class." Relying on original documentary evidence, we show that the authors of Rule 23 specifically crafted this language, in the wake of national efforts to desegregate schools, to give courts tools to resolve civil rights challenges to system-wide government policies—even when those policies affected individual plaintiffs in different ways. We also detail how, since that time, courts have consistently and appropriately relied on Rule 23(b) in a wide-range of actions for injunctive or declaratory relief, including Due Process challenges to government policies that undermine individual rights.

This Court has asked the parties to brief a set of questions related to the propriety of Rule 23(b)(2) class certification in this case, which involves a group of noncitizens who seek bond hearings after being detained for more than six months in connection with immigration proceedings. This brief provides a detailed look at the text and history of Rule 23, as well as subsequent judicial interpretations of the rule, in order to shed light on those questions. Amici make two points in support of the propriety of class certification in cases like this one.

First, the authors of the modern class action rule specifically drafted Rule 23 to address cases where a government defendant systematically interferes with private plaintiffs' rights. For that reason, they wrote Rule

23(b)(2) to apply when the defendant "has acted or refused to act on grounds that apply generally to the class." As the drafters made clear, this language allows courts to certify classes for injunctive or declaratory relief even when the defendant's actions threaten only "one or a few members of the class, provided it [defendant's conduct] is based on grounds which have general application to the class." Fed. R. Civ. P. 23(b)(2) Advisory Committee Notes to 1966 amendments. For decades, the federal courts have done just that. Nothing about the Supreme Court's recent treatment of Rule 23(b)(2), including its decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), gives any reason to depart from this time-honored practice.

Second, consistent with the history of Rule 23(b), courts have long relied on class actions to resolve constitutional challenges to agency procedures. Due process challenges, in particular, lend themselves to class certification, because they often raise generic questions about how system-wide hearing procedures impact a group of people who depend on them for relief. As the Supreme Court has recognized since *Mathews v. Eldridge*: "[P]rocedural due process rules are shaped by the risk of error inherent in the truth finding process as applied to the generality of cases, not the rare exceptions." *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976). Due process challenges thus permit courts to answer many petitioners' claims "in one

stroke," just as *Wal-Mart* requires, 564 U.S. at 350, precisely because they raise questions about generic procedures the government makes available for people who depend upon them for relief.

**ARGUMENT**

## I. The Modern Class Action Rule Was Designed to Facilitate Group Challenges to Unlawful Government Practices.

Rule 23(b)(2) provides that a class action is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class." Fed. R. Civ. P. 23(b)(2). In cases where plaintiffs seek injunctive or declaratory relief against the government, courts have long construed that language to mean that the defendant must (1) act in a "consistent manner toward members of the class" such that its "actions may be viewed as part of a pattern of activity," or (2) establish a "regulatory scheme common to all class members." 7AA Charles A. Wright et al., *Federal Practice and Procedure* § 1775 (3d ed. 2008) (collecting cases) ("Wright & Miller"). The Advisory Committee notes to Rule 23 make clear that courts should liberally certify classes under Rule 23(b) in such cases.

As set forth below, this construction is consistent with the view that the authors of the modern class action rule held of injunctive and declaratory relief class actions. The authors of the modern class action specifically crafted Rule 23 to address cases where a government defendant's policies or

practices systematically interfere with an individualized process theoretically available to plaintiffs to vindicate their rights. For decades, the federal courts have honored this original intent by certifying countless injunctive relief classes. The Supreme Court in *Wal-Mart* embraced, rather than repudiated, Rule 23(b)(2)'s careful design and history.

A. **The Advisory Committee That Drafted Rule 23 Intended That It Apply Expansively in Civil Rights Cases, Including Those For Declaratory Relief.**

The purposes and intentions of those who drafted the Federal Rules of Civil Procedure have long informed Rule 23's interpretation. *See*, *e.g. Wal-Mart*, 564 U.S. at 361 ("[I]n determining [Rule 23's] meaning we have previously looked to the historical models on which the Rule was based."); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842-43 (1999). The drafting history of Rule 23 confirms that the District Court's class certification order fits easily into a course of class action jurisprudence that stretches back to the modern class action's origins.

Civil rights cases are the "prime examples" of what Rule 23(b)(2) was designed to capture, and Rule 23 "builds on experience, mainly, but not exclusively, in the civil rights field." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (internal quotation marks and citations omitted); *see also* David Marcus, *Flawed but Noble: Desegregation Litigation and Its*

*Implications for the Modern Class Action*, 63 Fla. L. Rev. 657, 678–91 (2011). The effort to revise Rule 23 coincided with efforts after *Brown v. Board of Education*, 347 U.S. 483 (1954), to desegregate public schools. By the early 1960s, a number of southern governments had jettisoned crude, explicit policies that simply required segregated schools. Instead, school boards gave children a default school assignment, but allowed them to petition to have that assignment changed. Marcus, *supra*, at 684-85. Whether a board would grant any particular child's petition ostensibly depended on a host of individual, facially nondiscriminatory factors specific to each one. *E.g.*, *Joyner v. McDowell Cnty. Bd. of Educ.*, 92 S.E.2d 795, 798 (N.C. 1956).

As administered, however, these processes left segregated schools almost entirely intact. Boards made default assignments by race, then systematically deployed a set of practices—foot-dragging, pretextual denials, and the like—to reject individual petitions. Marcus, *supra*, at 687-88. When challenged in class actions, governments invoked these individualized remedial processes to argue that no two children's claims to attend desegregated schools depended on common questions of law or fact. Such arguments succeeded in derailing desegregation class actions, even as schools remained categorically segregated. *E.g.*, *Brunson v. Bd. of Trustees*

*of Sch. Dist. No. 1 of Clarendon Cty.*, 30 F.R.D. 369, 370-71 (E.D.S.C. 1962).

The Committee members most responsible for the revised Rule 23 were "keenly interested" in these efforts to use individual remedial processes to defeat desegregation class actions. Letter from Charles Alan Wright, Professor of Law, Univ. of Texas, to Benjamin Kaplan, Professor of Law, Harvard Law Sch. (Feb. 16, 1963), *microformed on* CIS-7004-34 (Jud. Conf. Records, Cong. Info. Serv.).[2] An episode during the drafting process illustrates just how determined they were that courts certify classes in such cases. An early version of Rule 23(b)(2) would have made injunctive relief class actions only "presumptively maintainable." Memorandum, Modification of Rule 23 on Class Actions EE-10 to EE-11 (Feb. 1963), *microformed on* CIS-6313-56 (Jud. Conf. Records, Cong. Info. Serv.).[3] Charles Alan Wright, one of the committee members, objected. "It is absolutely essential to the progress of integration," Wright wrote the committee reporter Benjamin Kaplan, "that such suits be treated as class

---

[2] *See also* Rule 23 @ 50: The Fiftieth Anniversary of Rule 23, An Oral History of Rule 23: An Interview of Professor Arthur R. Miller by Samuel Issacharoff, N.Y. Univ. Sch. of Law Ctr. on Civil Justice 5 (Dec. 3, 2016)("[I]n the work on Rules 17 through 25, the centerpiece became Rule 23 . . . [a]nd within that centerpiece, the centerpiece was civil rights."); Marcus, *supra*, at 703 n.267 (quoting Wright's letter).
[3] The Advisory Committee documents quoted here are also referenced in Marcus, *supra*, at 704-08.

actions . . . ." Letter from Charles A. Wright. Professor of Law, Univ. of Texas, to Benjamin Kaplan, Professor of Law, Harvard Law Sch. (Feb. 6, 1963), *microformed on* CIS-6312-65 (Jud. Conf. Records, Cong. Info. Serv.).

Wright then sent Kaplan a letter that quoted extensively from *Potts v. Flax*, 313 F.2d 284 (5th Cir. 1963). *See* Wright Letter (Feb. 16, 1963), *supra*. There, a school board attempted to defeat a class action on grounds that any particular student's assignment to any particular school required an individualized process. The Fifth Circuit refused to allow this mirage of individualized treatment to thwart the plaintiffs' challenge. "Properly construed," the Fifth Circuit reasoned, "the purpose of the suit was not to achieve specific assignment of specific children to any specific . . . school." Rather, the suit "was directed at the system-wide policy of racial segregation." *Potts*, 313 F.2d at 288. After receiving Wright's letter quoting from *Potts*, Kaplan redrafted Rule 23(b)(2) to suggest that such class suits should simply be "maintained," and he included *Potts* in the Advisory Committee's note on the revised rule as an exemplar of the Rule 23(b)(2) class action. Memorandum, *Modification of Rule 23 on Class Actions* EE-2 (Feb. 1963), *microformed on* CIS-6313-56 (Jud. Conf. Records, Cong. Info. Serv.).

Deliberations over other categories of class actions confirmed Rule 23(b)(2)'s intended reach. At one point, committee member John Frank—who was concerned about the abusive use of class actions in cases for monetary relief—advocated for Rule 23(b)(2)'s abandonment. He invoked Rule 23(b)(1)(A), which allows for certification when "inconsistent or varying adjudications with respect to individual class members . . . establish incompatible standards of conduct for the party opposing the class . . . ." Fed. R. Civ. P. 23(b)(1)(A). Frank believed a court could certify a desegregation class under this section, obviating the need for Rule 23(b)(2). Marcus, *supra*, at 705-06. By individualizing the remedial process for desegregation, however, southern governments could be forced to allow one black child to attend an all-white school, while refusing the same for other black children. As Kaplan and Wright appreciated, Rule 23(b)(1)(A) applies only when the defendant cannot possibly tailor its policy or course of conduct to particular individuals. Marcus, *supra*, at 706-07; Maureen Carroll, *Class Action Myopia*, 65 Duke L.J. 843, 854 (2016). It does not address instances when the defendant can treat class members individually but chooses instead to subject them to a single policy or set of systemic practices. As Kaplan argued in response to Frank, "[Rule 23(b)](2) must remain in to make it absolutely clear that the desegregation cases . . . are

covered." Transcript of Session on Class Actions 11 (Oct. 31, 1963–Nov. 2, 1963), *microformed on* CIS-7104-53 (Jud. Conf. Records, Cong. Info. Serv.).[4]

To the extent that the Committee worried about Rule 23(b)(2)'s reach, the problem it considered was not related to civil rights litigation. Indeed, the Committee's sole concern about limits to the Rule 23(b)(2) class action confirms that the answer to the Supreme Court's question "whether that remedy [i.e. corresponding declaratory relief] can sustain the class on its own" is a clear yes. *Jennings v. Rodriguez*, 138 S.Ct. 830, 851 (2018). Several committee members feared that, in the wake of a mass accident like an airplane crash, the tortfeasor would bring a case under Rule 23(b)(2) against a defendant class of victims for a declaratory judgment of no liability. Brian T. Fitzpatrick, *The Ironic History of Rule 23* (Vand. Law Research Paper No. 17-41, Aug. 10, 2017), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=3020306. Such a tortfeasor would have had a plausible argument under the penultimate draft of Rule 23(b)(2), which provided for certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate specific or declaratory final relief with

---

[4] *See also* Marcus, *supra*, at 707.

respect to the class as a whole . . . ." Memorandum from Benjamin Kaplan and Albert Sacks to the Fed. Civil Rules Advisory Comm. at 8, (Dec. 2, 1963), at 8 (on file with authors).

The Committee rewrote Rule 23(b)(2) in response to this concern. The revised text, which would subsequently undergo only stylistic modifications before Rule 23's promulgation, allowed certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or *corresponding* declaratory relief with respect to the class as a whole . . . ." Kaplan & Sacks Memorandum, *supra*, at 8 (emphasis added). As a Committee memorandum discussing the revision explained, "concern was expressed that the text of (b)(2) . . . might inadvertently permit class actions for a declaration related exclusively or predominantly to liability for money damages." *Id.* at 7. The Committee rewrote the rule "to make clear that the class actions under (b)(2) are limited to instances in which the appropriate final relief is either injunctive relief or is declaratory relief corresponding to injunctive relief." *Id.* "Corresponding declaratory relief" is thus best understood as corresponding in nature to injunctive relief, to exclude declaratory relief that corresponds in nature to monetary damages. Nothing in this revision suggests any intention by the Committee to

withdraw cases for declaratory relief from Rule 23(b)(2)'s reach. The Committee intended its revision to "strengthen[] the (b)(2) category," not to constrict its application in civil rights litigation. *Id.*

As the examples of class actions described in Part II demonstrate, federal courts to this day have honored the Advisory Committee's hope that Rule 23 would prove a powerful weapon for the vindication of civil rights, no matter how hard a government tried to cloak systemic wrongdoing in the guise of individualized treatment. The district court's order in this case is just another recent instance in this unbroken line of decisions.

## B. *Wal-Mart* Embraced Rule 23(b)(2)'s History and Design.

The Supreme Court in *Wal-Mart* acknowledged the long, well-established use of Rule 23(b)(2) in injunctive relief cases against the government. Recounting the history of the class action rule, the Court explained that "the Rule reflects a series of decisions involving challenges to racial segregation—conduct that was remedied by a single classwide order." 564 U.S. at 361. In so doing, it recognized that "civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Id.* (citing *Amchem,* 521 U.S. at 614).

The Supreme Court's primary concern in *Wal-Mart* was employment discrimination cases where parties seek back pay along with injunctive relief. The Court declared that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class," and not when class members seek "*individualized* relief (like the back pay at issue . . .)" in that case. 564 U.S. at 360.[5] This holding narrowed the interpretation of Rule 23 that courts had adopted to facilitate the litigation of Title VII class actions. *E.g.*, *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir. 1968).[6] But the line between monetary and injunctive relief has nothing to do with the instant case. Plaintiffs here do not seek back pay or any other sort of individualized remedy. They seek a "single injunction"—an order requiring bond hearings for immigrants in prolonged detention—that will "provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

---

[5] As the Court in *Wal-Mart* recognized with this reference to "a single injunction *or declaratory judgment*," 564 U.S. at 360 (emphasis added), courts have certified class actions that seek only declaratory relief, just as the Advisory Committee intended. *See* Wright & Miller, *supra*, § 1775 (3d ed. 2008) (collecting cases where courts certified class actions for "corresponding declaratory relief," such as "[a] request for a declaration that a particular patent is invalid or that a statute is unconstitutional").

[6] *See* David Marcus, *The History of the Modern Class Action, Part I: Sturm und Drang, 1953-1980*, 90 Wash. U. L. Rev. 587, 640 & nn. 309-310 (2013) (describing criticism of the Title VII cases that *Wal-Mart* rejected).

*Wal-Mart*'s other holding involves Rule 23(a)(2)'s commonality requirement. To satisfy the commonality requirement, the Court declared, the plaintiffs' claims must depend upon "a common contention" such that "the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 351. Moreover, plaintiffs cannot just plead that the defendants' undifferentiated conduct toward all of them contributed to each one's injury. They must establish this common connection with "significant proof." *Id.* at 353.

As time has passed, it has become clear that *Wal-Mart*'s commonality holding is fundamentally consistent with the historical role of class certification in civil rights litigation. *Cf. Braggs v. Dunn*, 317 F.R.D. 634, 667 (M.D. Ala. 2016) (suggesting that Rule 23's "requirements are 'almost automatically satisfied in actions primarily seeking injunctive relief'") (citation omitted). Federal courts do require plaintiffs to adduce more robust evidence in cases where there is a reason to ask whether a common thread indeed connects all of their experiences. *Compare M.D. v. Perry*, 675 F.3d 832, 842 (5th Cir. 2012), *with M.D. v. Perry*, 294 F.R.D. 7, 38-45 (S.D. Tex. 2013). In particular, plaintiffs can no longer rely on allegations that their various harms all flow from the defendant's informal but systemic common

practice; they have to establish with evidence that this is so. *Wal-Mart*, 564 U.S. at 351.

But *Wal-Mart*'s commonality holding does not require that evidentiary showing when plaintiffs allege that the defendant's explicit, system-wide policy injures them. The idea that the class relief must apply "as to all" was a reference to the widely-respected work of Richard Nagareda. *Wal–Mart*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Nagareda, who served as a reporter for the American Law Institute's *Principles of the Law of Aggregate Litigation,* worried that the Court could not provide a common remedy to the millions of women who sought money damages based on decisions made in Wal-Mart stores around the country. However, in that same passage, Nagareda also referred readers to a portion of the ALI's *Principles*, which explained why injunctive relief against the government often would "apply to all":

> [I]n litigation against governmental entities . . . the generally applicable nature of the policy or practice typically means that the defendant government will be in a position, as a practical matter, either to maintain or discontinue the disputed policy or practice as a whole, not to afford relief therefrom only to the named plaintiff.

Nagareda, *supra*, at 132 n.123 (citing *Principles of the Law of Aggregate Litig*. § 2.04 cmt. a at 112).

The Supreme Court has asked this Court to consider, and this Court has directed the parties to address, "whether a Rule 23(b)(2) class action continues to be the appropriate vehicle for respondents' claims in light of" *Wal-Mart*. *Jennings*, 138 S.Ct. at 851. Because the plaintiffs here challenge the Government's express, blanket refusal to give any class member a bond hearing to make his or her case for release, this question can be answered quite easily: The individualized monetary damage questions in *Wal-Mart*— which the plaintiffs did not attribute to any single company-wide policy— raised totally different concerns than are raised by class actions that seek relief from uniform government practices. The Court in *Wal-Mart* did not repudiate the Advisory Committee's intentions for Rule 23(b)(2) or decades of consistent judicial practice certifying class actions challenging system-wide governmental policies.

In some cases decided after *Wal-Mart*, courts have certified subclasses based on a determination that the resolution of different class members' claims would depend on entirely different legal or factual questions, such that the undivided class failed to satisfy commonality. *See, e.g.*, *M.D. v. Perry*, 294 F.R.D. 7, 31 (S.D. Tex. 2013) (creating a general class and subclasses, the contours of which were defined by "the policy that the Plaintiffs allege is causing the harm and the group of children . . . they allege

are being harmed by that policy"). Here, all class members challenge the government's blanket refusal to provide them with bond hearings after detaining them for more than six months, and the district court created subclasses based on the extant statutory release procedures pursuant to which each class member was denied release. So long as prolonged detention without a bond hearing either is or is not unlawful as to each member of a given subclass, commonality is satisfied, and further subclassing is not required.

## II. Courts Have Long Relied On Class Actions, Consistent with Rule 23's Design, To Resolve Due Process and Other Challenges to Government Conduct.

### A. Challenges to Government Conduct Lend Themselves to Classwide Determinations Under Traditional Due Process Analysis.

Consistent with the history of Rule 23(b), courts have long relied on class actions to resolve constitutional challenges to agency decisions—particularly when plaintiffs challenge a common procedure or allege such a consistent pattern of egregious delay from which a trier of fact might infer a systemic unconstitutional practice. *See, e.g., Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *4 (N.D. Ill. Apr. 28, 2017) (collecting cases); Wright & Miller, *supra*, § 1775 (3d ed. 2008) (collecting cases where "Rule 23(b)(2) . . . has been used extensively to challenge" complex benefit

schemes). Due process challenges, in particular, lend themselves to class certification because they often raise generic questions about how the same system-wide hearing procedures impact a group of people who depend on them for relief.

From the beginning of its modern decisions on procedural due process, the Supreme Court recognized that the inquiry turns on these generic questions. In *Mathews v. Eldridge*, 424 U.S. 319 (1976), for example, the Supreme Court weighed the government's refusal to permit hearings against the private interests of an entire population of social security beneficiaries. Describing general features of the social security hearing process, and an average claimant's ability to use that process, the Supreme Court believed the risk of erroneously denying a beneficiary's case based on written submissions was low. *Id.* at 345. The Court stressed the importance of evaluating procedures as they applied to the entire claimant population. Providing more process for some beneficiaries, according to the Court, might come at the expense of other claimants' recoveries as well as the public coffers. *Id.* at 348. The Court acknowledged that decisions about "veracity" occasionally may impact an individual's entitlement to relief in a single case, but in the end, the Court broadly endorsed the government's hearing procedures for all claimants. "[P]rocedural due process rules are

shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases," emphasized the *Mathews* Court, "not the rare exceptions." *Id.* at 344.

Accordingly, after *Mathews*, federal courts routinely found no obstacle to certifying injunctive relief classes in procedural due process cases. In 1980, the Eighth Circuit reversed a decision by the district court denying class certification when patients held in a state mental hospital challenged the facility's commitment and release procedures as inconsistent with due process. *Coley v. Clinton*, 635 F.2d 1364, 1366 (8th Cir. 1980). The fact that orders of release for individual patients would depend on "facts peculiar to their individual cases" could not thwart the classwide challenge, especially given Rule 23(b)(2)'s purpose – "to enable plaintiffs to bring lawsuits vindicating civil rights." *Id.* at 1378.

In the next decade, a class of children alleging "systemic deficiencies" in the administration of a city's foster care system won certification. *Baby Neal v. Casey*, 43 F.3d 48, 53 (3d Cir. 1994). Each child's experience in the system differed and each individual class member had his or her own "individual service needs." *Id.* at 55. Nonetheless, as the Third Circuit observed, "(b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that the

defendant's conduct [was] central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Id.* at 57.

Indeed, many landmark due process challenges to social security, immigration, and other state proceedings in the Supreme Court proceeded as class actions—ensuring that the Court had a complete record to address the full scope of the legal issues alleged. *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 701 (1979) ("[T]he class-action device save[d] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion."); *McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479, 488 (1991) (noting a district court's finding of jurisdiction and grant of class certification in a case challenging the administration of an immigration program that failed to provide applicants with notice, translation services, or an opportunity to challenge adverse witnesses).[7] Even *Goldberg v. Kelly,* which emphasized that the "opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard," was brought as a consolidated

---

[7] *See also, e.g., Goss v. Lopez*, 419 U.S. 565, 584 (1975) (class action against Columbus school system); *Ingraham v. Wright*, 430 U.S. 651, 682 (1977) (class action of school children seeking injunctive relief from corporal punishment); *Greene v. Lindsey*, 456 U.S. 444 (1982) (finding that a "service by posting" law violated due process in an injunctive relief class).

action and uniformly affirmed plaintiffs' right to a hearing. 397 U.S. 254, 268–69 (1970).

Long after *Wal-Mart,* courts have continued to certify Rule 23(b)(2) class actions alleging that the government violated procedural due process. *See, e.g., Murphy v. Piper*, No. CV 16-2623, 2017 WL 4355970, at *10 (D. Minn. Sept. 29, 2017) ("Plaintiffs' due process claims are capable of [c]lasswide resolution because the Court can determine with respect to the class as a whole whether Defendant is fulfilling her statutory obligation to ensure that adequate notice and opportunity for a hearing is being afforded"); *Sourovelis v. City of Phila*., 320 F.R.D. 12, 22 (E.D. Pa. 2017) (certifying class challenging Philadelphia civil forfeiture rules that deprived parties of procedural due process).

As noted above, courts have occasionally divided different groups seeking injunctive relief into subclasses, but this is rarely required. Absent a "fundamental conflict" among members of the class, class counsel can represent the interests of different groups in injunctive relief cases, and the court can resolve their claims. *See, e.g.,* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:45 (8th ed. 2011) ("McLaughlin"); *In re Deepwater Horizon*, 739 F.3d 790, 813 n.99 (5th Cir. 2014) (collecting cases). A fundamental conflict will be present in money damage cases, for

example, when "some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (money damages antitrust class action). Under those circumstances, any relief pursued by class counsel would necessarily harm some class members and benefit others. There is no such trade-off here, where all class members share an interest in challenging the government's blanket denial of bond hearings.

Procedural due process class actions like this one permit courts to answer many petitioners' claims "in one stroke" precisely because they raise questions about generic procedures the government makes available for people who depend upon them for relief. *See, e.g., Braggs*, 317 F.R.D. at 663 (prisoners' procedural due process challenge can be "answered in one stroke—namely, by determining whether . . . involuntary-medication practices adequately protect due-process rights."); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1203 (N.D. Cal. 2017) ("The procedural due process claim for which A.H. seeks class-wide preliminary injunctive relief is amenable to common answers."); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (affirming class certification of plaintiff's due process claim, observing that such "[c]ases alleging a single

course of wrongful conduct are particularly well-suited to class

certification"). Classwide findings help courts assess the full impact of

government procedures on an entire population, a determination that the Due

Process Clause often requires. *Parham v. J. R.*, 442 U.S. 584, 615 (1979)

("[I]t bears repeating" that "procedural due process rules are shaped by the

risk of error . . . as applied to the generality of cases.") (internal quotation

marks and citation omitted). Moreover, as set forth in Part II.C., class actions

help parties, courts, and the government itself promote efficiency,

consistency, and participation in large-scale adjudication.

> **B.      Challenges to Government Conduct Lend Themselves to
> Classwide Determinations in a Wide Variety of Other
> Cases.**

Outside of the procedural due process arena, a long and unbroken line

of case law establishes that class certification is appropriate when the

government categorically refuses to provide claimants with the

individualized consideration to which they allege they are entitled.

For example, the gravamen of many equal protection claims is that the

defendant has treated the plaintiffs as interchangeable members of a racial

group rather than as individuals. Yet the Supreme Court has recognized that

"suits alleging racial or ethnic discrimination are often by their very nature

class suits, involving classwide wrongs." *E. Texas Motor Freight Sys. Inc. v.*

*Rodriguez*, 431 U.S. 395, 405 (1977). Consider *Frasier v. Board of Trustees of the University of North Carolina*, 134 F. Supp. 589 (M.D.N.C. 1955), a case cited in the Advisory Committee note to the 1966 amendments that created Rule 23(b)(2). In *Frasier*, the defendant public university categorically refused to admit African American students. *Id.* at 590. That group-based treatment made class certification appropriate, notwithstanding that the plaintiff class sought (and ultimately received) an order requiring the university to consider African American applicants on the basis of their own unique qualifications. *Id.* at 593.

Over the past several decades, courts have continued to recognize the propriety of class certification in equal protection cases where the government has used categorical rules in place of individualized treatment. For example, in *Gratz v. Bollinger*, 539 U.S. 244 (2003), the defendant university automatically distributed a fixed number of points to all applicants who belonged to an underrepresented minority group, an approach that the Supreme Court held unlawful because it failed to provide applicants with the required degree of individualized consideration. *Id.* at 271-72. The Court found that the "history of this case demonstrates [that] the class-action device saved the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated

in an economical fashion." *Id*. at 268 n.17 (internal quotation marks and citation omitted).

Similarly, in the Fourth Amendment context, courts have long recognized the propriety of class certification in cases where the government has conducted searches or seizures based on impersonal, blanket rules rather than individualized suspicion. For example, when law enforcement officers operate a checkpoint at which they stop all cars seeking to pass through, courts routinely certify classes consisting of those subjected to that categorical treatment. *See, e.g., City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (drug checkpoints); *Norwood v. Bain*, 166 F.3d 243 (4th Cir. 1999) (weapons checkpoint); *McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174 (7th Cir. 1993) (parking lot checkpoint).

Just as in the Due Process context, it does not matter whether the government's categorical behavior toward a class will affect different individuals within the class differently. For example, in *Zablocki v. Redhail*, 434 U.S. 374 (1978), the plaintiff class challenged a Wisconsin statute restricting the marriage rights of parents who are subject to child support orders. The Supreme Court noted that some class members would be "absolutely prevented from getting married," others would be "coerced into forgoing their right to marry," and still others would be able to marry only

after suffering "a serious intrusion into their freedom of choice." *Id.* at 387. Class treatment under Rule 23(b)(2) was nonetheless appropriate.[8]

Nor does it matter whether the plaintiffs' claims are constitutional as opposed to statutory. For example, in *Sullivan v. Zebley*, 493 U.S. 521 (1990), a plaintiff class of children challenged the Social Security Administration's denial of their applications for Supplemental Security Income (SSI) benefits. The agency based the denials on its policy of refusing SSI benefits to all children whose impairments did not appear on a particular list. The Supreme Court ruled in favor of the plaintiff class, finding the blanket policy unlawful because an "individualized, functional approach to child-disability claims" was statutorily required. *Id.* at 539. Just as in each of the foregoing cases, class certification was appropriate *precisely because* the plaintiffs sought individualized consideration that the governmental defendant categorically failed to provide.

*Wal-Mart* does nothing to call into doubt the reasoning of these cases, as federal appellate courts considering this question have recognized. Since the Supreme Court's 2011 decision in *Wal-Mart*, the federal courts of

---

[8] Most established treatises on class action procedure agree that differences among class members should not limit opportunities for classwide injunctive relief. 1 McLaughlin, *supra*, § 4:7; 1 William B. Rubenstein, *Newberg on Class Actions* § 3:23 (5th ed. 2017) ("Newberg"); Wright & Miller, *supra*, § 1775.

appeals have issued ten published decisions analyzing the merits of class certification motions in injunctive relief cases against government defendants.  In six of those cases, the courts either affirmed decisions granting class certification or reversed decisions denying class certification. *Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017); *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017); *Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016); *In re District of Columbia*, 792 F.3d 96, 102 (D.C. Cir. 2015); *Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015); *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014).  In two others, district courts re-certified classes after courts of appeals had vacated class certification orders and remanded for reconsideration in light of *Wal-Mart*.  *M.D. v. Perry*, 675 F.3d 832 (5th Cir. 2012); *M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013); *DL v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013); *DL v. District of Columbia*, 302 F.R.D. 1 (D.D.C. 2013).  In only two cases since *Wal-Mart* have courts of appeals rendered decisions that left timely injunctive or declaratory relief classes uncertified.[9]  *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541 (7th Cir. 2016); *Jamie S. v. Milwaukee Public Sch.*, 668 F.3d 481 (7th Cir. 2012). And in each of *those* cases, the plaintiffs failed to show

---

[9] In one other case, *Truesdell v. Thomas*, 889 F.3d 719 (11th Cir. 2018), the plaintiff never sought class certification under Rule 23(b)(2) in the district court.

that the defendants in fact engaged in a blanket policy or practice affecting

the entire class.[10] That is plainly not the case here.

### C. Private Parties, Courts, and the Government Benefit From The Well-Established Use of Injunctive Relief Class Actions.

Aggregate procedures promote efficiency, fairness, and consistency in

the review of agency action. First, aggregate procedures help government

agencies respond to allegations of group-wide harm more efficiently than

piecemeal, individual adjudication. A recent Federal Circuit decision, for

example, denied an individual veteran's petition to review his claim for

unreasonable delays, reasoning that a class action would provide a more

appropriate format to hear his procedural challenge. The Court reasoned that

individual petitions would produce only "line-jumping" that would

aggravate delays throughout the VA system. *Ebanks v. Shulkin*, 877 F.3d

1037, 1040 (Fed. Cir. 2017). The efficiencies afforded by aggregation can be

especially helpful in the administration and review of large mass

adjudication programs. *See* Michael D. Sant'Ambrogio & Adam S.

Zimmerman, *The Agency Class Action*, 112 Colum. L. Rev. 1992, 2010-12

(2012) (without aggregation procedures, large public benefits programs

---

[10] *See Phillips*, 828 F.3d at 558 ("Just as in *Wal–Mart*, proof of a systemic practice which could tie all the claims together is 'absent here.'"); *Jamie S.*, 668 F.3d at 498 ("[A]s in *Wal–Mart*, proof of an illegal policy 'is entirely absent here.'").

waste resources in "duplicative litigation, requiring frequent remands to address common factual errors, and hampering the efficient development and enforcement of law").

Second, aggregate rules can expand access to legal representation. Class actions allow courts to craft uniform remedies with full participation from parties with different interests in relief. *See* Newberg, *supra*, § 1:10 (the "primary function" of Rule 23 is "to ensure the protection of absent class members' rights"). Aggregate procedures can also increase accountability by providing remedies for wide and diffuse harms that are too costly to be prosecuted through individual claims and appeals. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). In recent cases raising procedural due process challenges to practices at the Department of Veterans Affairs, for example, two former general counsels to the VA highlighted ways that class actions help courts to efficiently serve as a "lawgiver and error corrector" in cases that repeatedly raise, but often evade, review. *See* Brief of Amicus Curiae Former General Counsels of the Department of Veterans Affairs, Will A. Gunn & Mary Lou Keener, *Monk v. Shulkin*, Court of Appeals for Veterans Claims , Case No. 15-1280, at 8 (Feb. 8, 2018). Lack of adequate counsel in mass adjudication systems, like immigration cases, may make class action relief particularly necessary so that courts may

continue to perform their own constitutional role—ensuring the executive branch observes the law and serves the interests of those who depend on that for relief.

Finally, aggregate procedures provide for uniform and consistent application of law when many different people challenge the same organizational misconduct. Newberg, *supra*, § 1:10 (aggregate procedures "reduce[] the risk of inconsistent adjudications"). For example, in the 1970s, the Civil Service Commission adopted class action rules to adjudicate claims of discrimination inside the federal government, after courts had determined that such claims against governmental programs could not be brought *in the absence* of a class action. *Barrett v. U.S. Civil Service Comm'n*, 69 F.R.D. 544, 550 (D.D.C. 1974) (ordering United States Civil Service Commission to adopt class action rules for federal employees because "any action" for workplace discrimination necessarily "*involves considerations beyond those raised by the individual claimant*") *citing Hackley v. Roudebush*, 520 F.2d 108 (D.C. Cir. 1975) (emphasis in original). The Equal Employment Opportunity Commission, which has succeeded the Civil Service Commission in resolving such disputes, deems class procedures to be critical in light of the volume of claims it processes each year, the potential for inefficient and inconsistent judgments, and the

otherwise limited access to counsel. *See, e.g.,* 57 Fed. Reg. 12,634, 12,639 (Apr. 10, 1992) (describing inconsistent judgments that are rendered in the absence of class actions).

The government itself has long achieved consistent results through classwide decision-making. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 467 (1983) (social security grids); *United States v. Storer Broad. Co.,* 351 U.S. 192 (1956) (broadcast licenses). Consistent with due process, agencies may resolve whole classes of issues "that do not require case-by-case consideration" to avoid "continually . . . relitigat[ing] issues that may be established fairly and efficiently in a single" proceeding. *Heckler*, 461 U.S. at 467. To that end, the Administrative Conference of the United States— which provides guidance to all federal agencies—has recommended that agencies make greater use of class actions and declaratory orders in order to "pool . . . information about recurring problems," achieve "greater equality in outcomes" in injunctive relief cases, and provide "clarity and certainty." Aggregation of Similar Claims in Agency Adjudication, 81 Fed. Reg. 40259, 40260 (June 21, 2016); Declaratory Orders, 80 Fed. Reg. 78163 (Dec. 16, 2015). In this way, "group procedures can form an integral part of public regulation and the adjudicatory process itself." Michael D. Sant'Ambrogio

& Adam S. Zimmerman, *Inside the Agency Class Action*, 126 Yale L.J. 1634, 1645 (2017).

## CONCLUSION

Certification of injunctive and declaratory relief class actions challenging government policies is consistent with Rule 23(b)(2)'s text, design, and history, as well as a long and unbroken line of case law. Such cases permit courts to answer many petitioners' claims "in one stroke," just as *Wal-Mart* requires, precisely because they often raise system-wide policy concerns for claimants, while conserving the resources of the courts, private parties, and the government.

Dated:  July 27, 2018     Respectfully submitted,

/s/ *Elizabeth J. Cabraser*
Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
415.956.1000

Jonathan D. Selbin
Jason L. Lichtman
Katherine I. McBride
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 3444-9500

Andrew R. Kaufman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(b) and Fed. Circ. R. 29-2(c)(2), because it contains 6,944 words,

excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Office Word

2010 in Times New Roman type style, 14-point font.


Dated: July 27, 2018                    By: */s/ Jason L. Lichtman*
                                        Jason L. Lichtman
                                        **LIEFF CABRASER HEIMANN &**
                                        **BERNSTEIN, LLP**
                                        250 Hudson Street, 8th Floor
                                        New York, NY 10013
                                        212.355.9500

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System on July 27, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 27, 2018        By: */s/ Jason L. Lichtman*
                                      Jason L. Lichtman
                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                      250 Hudson Street, 8th Floor
                                      New York, NY 10013
                                      212.355.9500